AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

District of Oregon

Certified to be a true and correct copy of original filed in this District
Dated: 04/28/2026
MELISSA AUBIN, Clerk of Court
U.S. District Court of Oregon
By: s/E. Toles
Pages 1 Through 40

United States of America
v.
[redacted] [redacted] Tania Argueta, Patsy Escobar, Angel Lopez, Rene Cazares, [redacted] Julia Dorfler, Matthew Medieros, [redacted] Patrick Newport, Felicia Waite and [redacted]
*Defend*

Case No. 6:26-mj-108

## CRIMINAL COMPLAINT
## BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of April 2022 to present in the county of Lane and elsewhere in the District of Oregon and elsewhere, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1),(b)(1)(A)(vi) and (viii) and 846 | Conspiracy to possess with the intent to distribute over 500 grams or more of a mixture or substance containing methamphetamine and over 400 grams or more of a mixture or substance containing fentanyl, Schedule II controlled substances (all defendants) |
| 21 U.S.C. §§ 841(a)(1),(b)(1)(A)(vi) | Possession with the intent to distribute over 400 grams or more of a mixture or substance containing a detectable amount of fentanyl, a Schedule II controlled substance ([redacted] Dorfler, Medieros, [redacted] Newport, Waite) |
| 21 U.S.C. §§ 841(a)(1),(b)(1)(A)(viii) | Possession with the intent to distribute over 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance (Cazares, [redacted] Medieros, [redacted] Waite) |
| 21 U.S.C. §§ 841(a)(1),(b)(1)(B)(vi) | Possession with the intent to distribute 40 grams or more of a mixture of substance containing a detectable amount of fentanyl, a Schedule II controlled substance (Argueta, [redacted] Cazares, [redacted] |
| 21 U.S.C. §§ 841(a)(1),(b)(1)(B)(viii) | Possession with the intent to distribute 50 grams or more of a mixture of substance containing a detectable amount of methamphetamine, a Schedule II controlled substance (Dorfler) |

This criminal complaint is based on these facts:
See attached Affidavit

☑ Continued on the attached sheet.

/s/ Kristofer Strubel, via Telephone
*Complainant's signature*

Kristofer Strubel, Task Force Officer, DEA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone at 2:16 p.m. a.m./p.m.

Date: April 28, 2026

Amy E Potter
*Judge's signature*

City and state: Eugene, Oregon

Hon. Amy E. Potter, U.S. Magistrate Judge
*Printed name and title*

DISTRICT OF OREGON, ss: AFFIDAVIT OF KRISTOFER K. STRUBEL

## Affidavit in Support of Criminal Complaint And Arrest Warrant

I, Kristofer Strubel, being duly sworn, do hereby depose and state as follows:

## Introduction and Agent Background

1. I have been employed as a State Trooper with the Oregon State Police since August 2015. I am currently a Detective with the Oregon State Police and a Task Force Officer, assigned to the Drug Enforcement Administration (DEA) Eugene Resident Office (ERO). My job assignment includes, but is not limited to, the investigation of violations of Title 21, United States Code, Sections 841(a)(1), 846, 843(b), and 856, which includes the detection, identification, and apprehension of those individuals involved in drug trafficking offenses. My training and experience include completion of the Oregon Department of Public Safety Standards and Training Basic Academy, Basic Narcotics Investigation, Pat McCarthy's Street Cop Training which includes the investigation, detection, and identification of controlled substances and conspiracy and complex investigations training. I currently hold an Intermediate Police Certification through the Oregon Department of Public Safety Standards and Training. Additionally, I have participated in numerous drug investigations since my employment with the Oregon State Police and as a Task Force Officer. I have consulted and conversed with numerous other agents and law enforcement from various local, state, and federal agencies on drug cases of all types. I have interviewed and operated informants, executed search warrant, arrested, and interviewed subjects involved in the smuggling and distribution of drugs, conducted physical surveillance, and utilized electronic and video surveillance. I am familiar with

investigations of Drug Trafficking Organizations and Transnational Drug Trafficking Organizations (hereinafter, "DTOs"), including identifying methods of importation and distribution of controlled substances, and how controlled substances are manufactured, consumed, packaged, marketed, smuggled, and distributed. I am also familiar with various tactics used by DTOs to import drugs into the United States, communicate with members of the DTOs, and arrange for transportation and distribution of drugs throughout the United States.

2. I submit this affidavit in support of a criminal complaint and arrest warrants for [redacted] Tania Argueta, Patsy Escobar, Angel Lopez, Rene Cazares, [redacted] Julia Dorfler, Matthew Medieros, [redacted] Patrick Newport, Felicia Waite and [redacted] (collectively, "Defendants"), for conspiracy to possess with the intent to distribute and possession with the intent to distribute methamphetamine and fentanyl, Schedule II controlled substances, in violation of 21 U.S.C. §§ 841(a)(1),(b)(1(A)(vi) and (viii) and 846. As set forth below, there is probable cause to believe, and I do believe, that [redacted] Tania Argueta, Patsy Escobar, Angel Lopez, Rene Cazares, [redacted] Julia Dorfler, Matthew Medieros, [redacted] Patrick Newport, Felicia Waite and [redacted] committed these offenses.

3. This affidavit is intended to show only that there is sufficient probable cause for the requested complaint and arrest warrants and does not set forth all of my knowledge about this matter. The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation

(including other law enforcement officers, interviews of witnesses, a review of records related to this investigation, communications with others who have knowledge of the events, and circumstances described herein), and information gained through my training and experience. Unless placed in quotes, the statements of individuals are not direct quotes, but rather the essence of what the individual said.

## **Applicable Law**

4. Title 21, United States Code, Section 841(a)(1) provides that it is prohibited for any person to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance including cocaine. Title 21, United States Code Section 846 provides that it is a crime to conspire to commit a violation of 21 U.S.C. § 841(a)(1).

5. Title 21, United States Code, Section 846 provides that "Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

## **Statement of Probable Cause**

6. The United States, including the Drug Enforcement Administration (DEA), Oregon State Police (OSP), Springfield Police Department (SPD), Eugene Police Department (EPD), South Coast Interagency Narcotics Team (SCINT), Corvallis Police Department (CPD), Corona Police Department, Alcohol Tobacco and Firearms (ATF) and Homeland Security Investigations (HSI) have been conducting a criminal investigation into a transnational drug trafficking organization (DTO) transporting drugs including methamphetamine and fentanyl into California from Mexico before distributing it across the United States including Oregon through

postal services and vehicles. Law enforcement has identified money couriers and launderers traveling across the United States to pick up large amounts of drug proceeds (U.S. Currency) before it was then sent back to Mexico.

7. As indicated herein, [redacted] ([redacted] is the Mexico based source of supply (SOS) and dispatcher for the DTO. Tania Argueta (Argueta) is a drug and money courier for the DTO traveling all over the United States to pick up drug proceeds. Angel Lopez (Lopez) and Patsy Escobar (Escobar) are stash house operators in Corona, California, using a combination of vehicles and postal service to distribute methamphetamine and fentanyl across the United States. Rene Cazares (Cazares) is the stash house operator in Salem, Oregon, receiving large amounts of controlled substances from couriers that he distributes at the direction of [redacted] to local Oregon customers. [redacted] (Reyes), [redacted] ([redacted] and [redacted] ([redacted] are couriers transporting large amounts of methamphetamine and fentanyl into Oregon by vehicle and postal services. [redacted] ([redacted] Julia Dorfler (Dorfler), Matthew Medieros (Medieros), [redacted] ([redacted] [redacted] ([redacted] [redacted] ([redacted] Patrick Newport (Newport), and Felicia Waite (Waite) are all local distributors for the DTO.

8. During this investigation law enforcement has seized (through search warrants, arrests, traffic stops, etc.) and/or directly purchased (through confidential informants and undercover law enforcement), approximately 56 pounds of fentanyl, 116 pounds of methamphetamine, more than $300,000, and 20 firearms from members of the DTO.

[redacted]

**A. December 3, 2024, Seizure of 605 grams of Fentanyl Sent by [redacted]**

9. On December 3, 2024, law enforcement seized a suspicious UPS parcel after a drug detection K-9 alerted to the presence of controlled substances. The package was sent from Lakewood, California, UPS store #0168 using a suspected fake name with the phone number 1-669-400-1727. The phone number was identified as being utilized by [redacted] out of San Jose, California.

10. A state of Oregon search warrant was applied for and granted, and a search of the parcel revealed a Doc McStuffins children's toy. The toy appeared to have been resealed into its original packaging with glue. It was also coated in axel grease, which was a common way this DTO transported drugs. As indicated in the pictures below, after being opened it revealed a saran wrapped bundle of fentanyl weighing approximately 605 grams. Both were later lab tested and came back as fentanyl.




11. Law enforcement obtained video from the UPS store in the timeframe the parcel was sent. The video showed [redacted] arriving at the store alone and dropping off the parcel on December 2, 2024. Law enforcement confirmed [redacted] was the female through a California driver's license photo. Using the phone number on the initial parcel law enforcement identified

[redacted] had shipped parcels using the fake name and phone number to Eugene, Kentucky, and Vermont.

**B. December 12, 2024, Seizure of 650 grams of Fentanyl Sent by [redacted]**

12. On December 12, 2024, law enforcement seized an additional suspicious parcel after a drug detection K9 alerted to the presence of controlled substances. The parcel was shipped from a UPS store in Long Beach, California, and sent to 2940 Crescent Avenue, Unit 224 in Eugene, Oregon.

13. Pursuant to a federal search warrant, law enforcement searched the parcel and located an identical Doc McStuffins children's toy to the previous seizure. The toy also appeared to have been resealed into its original packaging with glue and upon opening it revealed approximately 650 grams of fentanyl, which was later lab tested and confirmed as fentanyl.

**C. March 3, 2025, Seizure of 2310 grams of Fentanyl from [redacted]**

14. On March 3, 2025, law enforcement monitored the geolocation data for [redacted] phone pursuant to a court warrant. The phone was pinging north on I-5 towards Oregon.

15. At approximately 1:30 p.m., law enforcement located [redacted] in Medford, Oregon, operating a blue Volkswagen Taos bearing Oregon license plate 990NQP. Law enforcement followed [redacted] as she traveled into Eugene briefly losing surveillance of her, before locating the vehicle approximately 10 minutes later parked in the check-in area of the Comfort Suites Eugene hotel at 3060 E 25th Avenue.

16. Law enforcement continued surveillance of the vehicle, and at approximately 5:05 p.m., observed [redacted] exit the hotel and leave in the vehicle. [redacted] traveled to the Empire

Buffet at 1933 Franklin Boulevard. [redacted] remained inside of the vehicle until entering the restaurant at approximately 5:10 p.m. and exiting at around 5:25 p.m. carrying no food.

17. Law enforcement conducted a traffic stop and deployed a K9 to the exterior of the vehicle. The K9 alerted to the presence of controlled substances emitting from the vehicle. [redacted] told law enforcement her only belongings in the vehicle were a bag, cereal and a Tupperware container.

18. A search of the vehicle revealed a “Honeycombs” cereal box on the floorboard of the back passenger side. The box of cereal was too heavy to contain only cereal and when questioned, [redacted] told law enforcement that it contained “bricks”. Opening the box of cereal law enforcement located two-kilogram sized bricks of suspected fentanyl as indicated below, which was later lab tested and confirmed as fentanyl




19. [redacted] was transported to the Eugene Resident Office where she was Mirandized and interviewed. [redacted] told law enforcement that the drugs seized was "cocaine” and that she did not like to transport or be in contact with fentanyl and that she had never been involved in the

sale of fentanyl. [redacted] said that she believed the drugs were cocaine because that was all that she had been given to transport previously. She stated she was going to be paid $2,000 dollars for the trip and eventually admitted she had made numerous trips for the DTO including one in Los Angeles where [redacted] had been caught and arrested with blue M-30 fentanyl pills and had pending charges in Los Angeles.

20. [redacted] also eventually admitted to shipping drugs in toys in the mail for the DTO. [redacted] said she had sent 10-15 parcels containing drugs up to that point, and that about half had been intercepted by law enforcement. In the photos on [redacted] phone there was a photo of a shipping label for one of the parcels seized in this case. There was also a photo of a shipping label from a parcel sent by [redacted] to Columbus, Ohio, which had been intercepted by Ohio DEA and found to contain approximately one pound of fentanyl.

21. [redacted] consented to the search of her phone by law enforcement. Law enforcement then went through her Instagram, messages, photos, and WhatsApp in front of [redacted] was later shown a photo of the face of [redacted] [redacted] identified the photo as the person she knew as "[redacted] who she claimed was the leader who facilitated the DTO. [redacted] advised that she had spoken with [redacted] on facetime before and recognized him.

22. [redacted] also showed law enforcement a WhatsApp account for the name "[redacted] which was associated to the number 52-3334447942. The message thread of the conversation appeared to start on December 14, 2024. Most of the messages from "[redacted] appeared to be voice messages. Law enforcement listened to the voice messages and recognized the voice from previous drug investigations as [redacted] a Sinaloa, Mexico based dispatcher and source of methamphetamine and fentanyl.

23. [redacted] showed law enforcement another WhatsApp message thread with the name "[redacted] using the number 52-5574909956, [redacted] confirmed "[redacted] was the same person as "[redacted] the boss of the DTO who had been identified as [redacted] When law enforcement observed the message thread with "[redacted] all of the messages sent to [redacted] appeared to have been auto deleted. There was a voice message that [redacted] had sent to "[redacted] at 5:40 p.m. on March 3, 2025, which was the time that law enforcement had conducted the traffic stop on her.

24. In the voice message [redacted] stated, "I have the work in the car...and I was up the street from the fucking thing I was about to drop it off and I got fucking blurpped yo." [redacted] confirmed that "blurpped" meant that she had gotten pulled over by the Police. She also confirmed that "work" meant drugs. [redacted] advised that she had told "[redacted] earlier that the drugs "work" was in her hotel room, because he didn't want her driving around with it.

**<u>Tania Argueta and Seizure of 99 Grams of Fentanyl and 2.19 Kilograms of Methamphetamine</u>**

25. During the interview with [redacted] and while going through her cell phone law enforcement had observed a contact "Tania Argueta".

**A. 2022 Controlled Buy of 99 Grams of Fentanyl**

26. Argueta was already known to law enforcement as far back as April 2022 where they had conducted a DEA undercover (DEA-UC) law enforcement buy of fentanyl by contacting a Mexico based WhatsApp number and spoke to an unidentified man. After contacting the man, the DEA-UC was sent to a local Eugene gas station. Argueta showed up providing the DEA-UC with 99 grams of fentanyl. At this time [redacted] had not been identified as the unidentified man, but voice recordings received from this sound identical to

recordings from [redacted] phone with who she identified as [redacted] The fentanyl was later confirmed as fentanyl through a DEA-Lab.

**B. April 28, 2025, Transfer of Drugs from Argueta to [redacted]**

27. On April 28, 2025, law enforcement obtained information that [redacted] was traveling to Eugene, Oregon, from Coos Bay to purchase drugs from somebody related to the [redacted] DTO. At approximately 5:00 p.m., law enforcement located [redacted] vehicle, a purple Honda Accord bearing Oregon License Plate 433NXW, traveling through Eugene.

28. [redacted] vehicle pulled into the Safeway parking lot at approximately 5:37 p.m. Law enforcement observed him exit his vehicle and getting into the front passenger seat of a grey Toyota bearing California temporary permit (DE03Z67). According to DMV records, this vehicle was a 2013 Toyota Camry registered to Argueta.

29. Law enforcement was able to positively identify the driver of the California plated vehicle as Argueta. Law enforcement observed [redacted] in the front passenger seat of Argueta's vehicle and observed Argueta and [redacted] exchange something hand to hand. After being in Argueta's vehicle for less than a minute, [redacted] then exited, and Argueta then departed in it.

30. Within 45 minutes before and after the meeting with [redacted] Argueta had numerous WhatsApp contacts with Mexico based WhatsApp number 52-6695463234 again, which is the same number law enforcement had previously determined to be associated to the [redacted]

**C. May 2025 Collection of Drug Proceeds from Argueta**

31. In the first half of May 2025, a DEA undercover (DEA-UC 2) met with Argueta

and another male to collected money from the DTO to launder. On the day of the meet, the DEA-UC-2 met with Argueta in a public location in the District of Oregon and completed the money transfer. Argueta provided DEA-UC-2 with $80,000 to be laundered for the DTO through a bank account and the funds sent back to DTO.

32. In the second half of May 2025, a DEA undercover (DEA-UC-3) reached out to and requested $50,000 of suspected drug proceeds to be laundered. On the day of the meeting in the second half of May 2025, the DEA-UC-3 met with Argueta in a public location in the District of Oregon and completed the money transfer. Argueta provided the DEA-UC-3 with a large sum of U.S. Currency (over $40,000) to be laundered. Before and after these meets law enforcement observed WhatsApp communication between [redacted] and Argueta.

33. Based on my training, experience, and knowledge of this investigation I believe the money received from Argueta was drug proceeds that she had picked up from local customers and distributors of the DTO at the direction of [redacted]

**D. February 10, 2026, Arrest of Argueta with 2.19 Kilograms of Methamphetamine**

34. On February 10, 2026, at approximately 5:44 p.m., Argueta engaged in a hand-to-hand transaction with undercover (DEA-UC-4) law enforcement near Broadway and West 76th in New York, New York. During the transaction Argueta handed DEA-UC-4 a package containing a solid crystalline substance inside a vacuum sealed bag in exchange for $1,200.

35. Law enforcement continued to conduct surveillance on Argueta and observed her entering and later exiting a hotel located in the vicinity of Broadway and West 77th Street, New York, New York. At approximately 8:00 p.m., law enforcement officers approached Argueta after she left the hotel, identified themselves, and asked to speak with Argueta. Argueta

consented to a search of her hotel room. During the search law enforcement located three additional vacuum sealed bags. The contents of the vacuum sealed bags weighed approximately 2.19 kilograms and field-tested positive for the presence of methamphetamine.

**Angel Lopez and Patsy Escobar and Seizure of 1600 Grams of Fentanyl**

**A. Drugs and Drug Packaging Found on October 13, 2025**

36. On October 13, 2025, law enforcement identified that Escobar was staying at the Hayward Inn located at 1759 Franklin Blvd. in Eugene, Oregon. On October 16, 2025, Escobar contacted the front desk of the hotel, telling them she was expecting a package from UPS (United Parcel Service). Upon learning this, law enforcement contacted UPS and learned that a parcel had been shipped overnight via Next Day Air from Lopez in Los Angeles on October 15, 2025. The recipient on the parcel was Escobar in room #218 at 1759 Franklin Blvd. (Hayward Inn). The phone number listed under the sender portion of the parcel was (323) 743-6950, which was a number known to be utilized by Lopez.

37. Law enforcement contacted UPS and took possession of the parcel, which was identified as a large manilla envelop weighing approximately 2 lbs. Law enforcement deployed a certified Drug Detection K9 to check the parcel, and the K9 provided a final alert on the parcel, which indicated that the drug detection K9 detected the odor of controlled substances coming from the target parcel. The parcel was secured in the temporary drug vault, pending a federal search warrant. Law enforcement subsequently obtained a search warrant for the parcel and opened the parcel, which contained methamphetamine pipes, a lighter, plastic straw and a bag of methamphetamine, which may have been for personal use.

38. However, while the parcel was being seized, law enforcement conducted

surveillance at the Hayward Inn at 1759 Franklin Blvd., Eugene, Oregon 97403 observing both Escobar and Lopez checking out of room #218. Following Escobar and Lopez's departure and check-out from room #218, law enforcement accessed the room and searched it. Law enforcement located remnants of vacuum sealed bags within a greenish grocery bag in the bathroom garbage. One vacuum sealed bag had "[redacted] inscribed with blue marker. Law enforcement located two white gallon sized Ziploc bags containing suspected fentanyl residue in the living room inside a paper bag being used as a garbage container, and a yellow hand towel inside the bottom drawer of the living room dresser. A pair of black overalls and other clothing were located beside the yellow hand towel.

39. After the parcel seizure both Escobar and Lopez traveled back into California and have been residing at 4243 Adishian Way, Unit 103, Corona, California. Both Lopez and Escobar continue to be in contact with [redacted] through WhatsApp.

**B. Drug Packages Seized 1600 Grams of Fentanyl on March 17, 2026**

40. On March 17, 2026, law enforcement obtained information that the DTO would send a package of drugs, likely be around 1 kilogram of fentanyl. Law enforcement contacted drug detectives in Corona, California, who were able to set up surveillance on 4243 Adishian Way, Unit 103, Corona, California, the subscriber address on Escobar's cell phone and a suspected residence/stash house of both Escobar and Lopez.

41. Law enforcement also set up surveillance on the Mailstop located at 1973 Foothill Pkwy., Unit 110, Corona, California, which is the location where law enforcement has known shipped drugs in the past. At approximately 12:50 p.m., detectives observed Lopez exit the front door of 4243 Adishian Way, Unit 103 with two cardboard boxes and get into a vehicle.

Detectives followed the vehicle to 1973 Foothill Pkwy., Unit 110, where they observed Lopez walk into the Mailstop with the two boxes, and then walk out a few minutes later without the boxes. Detectives then followed Lopez as he returned to 4243 Adishian Way, Unit 103.

42. Both parcels were intercepted in transit and a search pursuant to a warrant on them revealed approximately 800 gross grams of fentanyl in each parcel. Tolls show that both Lopez and Escobar were communicating with [redacted] before, during, and after the parcels were mailed.

**C. Escobar's Communications Regarding the Seized Packages**

43. Law enforcements obtained messages sent on March 23, 2026, from a WhatsApp account that for "China" that contained a contact photo of Escobar based on previous surveillance of her and her California driver's license photo. In the message, Escobar sent a photo of a UPS parcel tracking and said, "*this is one of them*" and followed with an additional photo showing the tracking #1Z1349GW1531612312, which was the parcel noted above that had been seized and found to contain cocaine.

44. Escobar also messaged on WhatsApp, *"The other 2 are stuck in Kentucky idk why tho it says they had a processing error and are working to fix it as soon as possible hold on I'll show you."* Escobar then sent two images of the UPS tracking information for parcels showing tracking #1Z1349GW1532406696 and tracking #1Z1349GW1531648105, which were both parcels seized containing over a pound of fentanyl powder in each.

45. On April 8, 2026, Escobar messaged on WhatsApp stating*, "Cause I took a flight a couple days ago and dropped off the box with the remaining 200 If my scale is off then I probably sent it in that box, Ill tell him he can charge me for it I guess idk cause I don't have it*

*Im going through my notes too and yeah it should have been the 300.”*

**Julia Dorfler and Seizure of 900 Grams of Fentanyl and 270 Grams of Methamphetamine**

46. On January 21, 2026, law enforcement observed a phone number subscribed to Julia Dorfler in contact with a Mexico based phone number believed to be utilized by [redacted] Dorfler was known to law enforcement as a local fentanyl distributor in Lane County. At approximately 2:45 p.m., law enforcement observed Dorfler driving a vehicle in Springfield and conducted a traffic stop. A drug K9 was deployed and alerted to the presence of controlled substances coming from the vehicle. Dorfler consented to a search of her vehicle and law enforcement seized approximately 900 grams of fentanyl and 270 grams of methamphetamine, which was later sent to the DEA lab and confirmed as fentanyl and methamphetamine.

47. Dorfler claimed the drugs located were hers and from a Mexico based dispatcher she knew as “[redacted] Dorfler confirmed “[redacted] was the number law enforcement had already identified as being utilized by [redacted] Dorfler told law enforcement that she would go to Salem and pickup from an unknown Hispanic male. Dorfler told law enforcement that she would often be fronted up to a half kilo of fentanyl at a time. The expectation was that she would pay $15,000 and receive the full kilo and could pay the leftover $15,000 after she made some sales.

**[redacted] and 630 Grams of Fentanyl and 1 Pound of Methamphetamine**

48. On or about May 1, 2025, a Springfield Police Department Confidential Source (CS) stated that "Jessie" ([redacted] was selling pound level amounts of methamphetamine and fentanyl in Eugene, Lane County, Oregon. [redacted] was

identified in early 2025 as being in contact with a known [redacted] WhatsApp number by law enforcement.

49. On June 5, 2025, at the direction of law enforcement, the CS contacted [redacted] asking to purchase one pound of methamphetamine. At approximately 1:03 p.m., the CS and [redacted] agreed to meet at an Albertsons parking lot. The CS was provided $1,500 in U.S. currency to purchase the agreed upon one pound of methamphetamine.

50. Law enforcement set up on [redacted] residence located at 4360 Fox Hollow Rd. Eugene, Oregon, observed his cream-colored Lexus RX3 parked beside the residence. At approximately 1:12 p.m., law enforcement observed [redacted] backing out of the driveway in the Lexus. Law enforcement-maintained surveillance on the Lexus as it drove to the meet location at Albertsons.

51. At approximately 1:18 p.m., law enforcement observed the CS exit the CS's vehicle before walking over to the Lexus and get in the front passenger seat. Law enforcement could hear the CS and [redacted] exchange small talk and shuffling around and at approximately 1:23 p.m., the CS exited [redacted] vehicle and got back in the CS's own vehicle before driving out of the parking lot. The CS provided law enforcement approximately 580 grams that field tested positive for methamphetamine. It was also tested at the DEA lab and confirmed as methamphetamine.

52. On July 24, 2025, at approximately 11:00 a.m., law enforcement served a federal search warrant on [redacted] residence in Eugene, Oregon. [redacted] told law enforcement there were a few ounces of fentanyl and firearms inside the residence. Law enforcement conducted a search of the residence locating approximately 50 grams of fentanyl and 50 grams of

methamphetamine, which was later tested at the DEA lab and confirmed as fentanyl and methamphetamine. There were also three firearms found in the main living room area that were seized. One was a rifle without a serial number with a loaded magazine of 9 mm bullets directly next to it on top of the refrigerator. The other two were on the opposite side of the room with one handgun appearing to be a Polymer80 Inc. handgun, with a loaded magazine, however no rounds in the chamber, and no serial number on the other handgun was a model Jennings-22 handgun with a loaded magazine and serial number 454297.

53. [redacted] told law enforcement that he was working for a drug boss in Mexico that he only knew as, "[redacted] [redacted] advised that he had been talking with "[redacted] via WhatsApp, a number already identified as being utilized by [redacted] In messages from the day before the search warrant (07/23/25), "[redacted] sent audio messages to [redacted] advising that he wanted [redacted] to start completing some deals selling fentanyl, advising that they needed to make money. [redacted] told law enforcement that he would normally receive a load car of either methamphetamine and/or fentanyl at the direction of "[redacted] [redacted] advised he would then disperse the drugs to whoever "[redacted] directed him to. [redacted] advised that "[redacted] would frequently front drugs to dealers. [redacted] advised that drug couriers trafficking methamphetamine usually arrive in Oregon to meet him approximately 1-2 times a month. [redacted] advised loads of fentanyl arrive more frequent, on approximately a weekly basis.

**[redacted] and Seizure of 1753 Grams of Fentanyl**

54. During its investigation, law enforcement learned that [redacted] sent a fentanyl courier in route to a location in Porland, Oregon, supposedly transporting approximately

1 kilogram of fentanyl. On July 25, 2025, at approximately 2:30 p.m., law enforcement set up surveillance in the area the residence in Portland, Oregon. A white BMW, bearing California license plate 8FSX015 arrived in the area and parked on the side of the road.

55. Law enforcement conducted a traffic stop on the white BMW. [redacted] was the driver. Law enforcement deployed a Drug Detection K9 to conduct an open-air sniff of the exterior of the vehicle and the K9 alerted to the presence of controlled substances. [redacted] then stated that there was a package in the vehicle that he had picked up in California and was transporting up to Oregon. He advised he didn't know what was in the package, but believed it was marijuana. [redacted] advised the package was in the backseat of the vehicle, which he also confirmed was his.

56. Law enforcement searched the vehicle and located a purple paper bag that had something hard and heavy in it covered in a small hand towel. Law enforcement opened the bag and located a kilogram size brick of suspected fentanyl. That was wrapped tightly in duct tape, as well as a smaller vacuum sealed bag that contained what appeared to be a saran style wrapped bindle. The drugs were lab tested by the DEA and confirmed as approximately 1753 gross grams of fentanyl.

57. [redacted] then consented to allowing law enforcement to go through his phone. Law enforcement identified messages on WhatsApp from the same Mexico based number that [redacted] was talking to "[redacted] on. There were also audio messages in the message thread from the same voice that [redacted] had identified as being "[redacted] [redacted] also had a message thread with a number that showed to be the contact name Tania Campos, which law enforcement had already identified as being used by Argueta. In this message thread, there were

audio messages from a female. The messages also directed [redacted] to travel to a location to pick something up. [redacted] advised that was the location he was advised to go "pick up", speaking about the drugs he had.

**[redacted] and Seizure of 114.4 Grams of Fentanyl**

58. On June 5, 2025, law enforcement observed the location data for a vehicle tracker associated with a black Chrysler 300 bearing Oregon plate 850PWE and belonging to [redacted] was moving eastbound from Mapleton towards Eugene on State Route 126. At approximately 5:50 p.m., law enforcement observed it was now northbound on Interstate 5 (I-5).

59. Law enforcement followed it north on I-5 and at approximately 6:51 p.m., the Chrysler pulled into the Pilot Travel Center located at 4220 Brooklake Road NE, Brooks, Oregon 97305. The Chrysler parked in the parking spot located in the southeast corner of the parking lot, facing east. Law enforcement then observed a male, who they recognized as [redacted] exit the passenger seat of the vehicle wearing a white and black flannel shirt with black pants and a black baseball hat.

60. Law enforcement observed over the next 30 minutes [redacted] make multiple trips into the Pilot Travel Center before finally getting back into the Chrysler leaving the passenger side door partially open. Based on their behavior and leaving the passenger side door open it appeared as though they were waiting to meet with someone. [redacted] would intermittently exit the vehicle on his phone while looking around the parking lot.

61. Law enforcement observed at approximately 8:53 p.m. a white Honda Civic bearing Oregon plate ZWT051 entered the parking lot and parked three spots north of the Chrysler. The Honda was occupied by a Hispanic male and female appearing to be in their

early 20s. Law enforcement observed the vehicle's brake lights turn off and [redacted] immediately exited the Chrysler and walked directly to the Honda getting in the rear passenger seat. At approximately 8:55 p.m., [redacted] exited the Honda and got back into the passenger seat of the Chrysler. Law enforcement observed at approximately 8:56 p.m., the Honda left the parking lot and went east before taking the I-5 north exit towards Portland. The entire interaction lasted approximately two minutes, and the occupants of the Honda didn't contact anyone else and never got out of their vehicle.

62. The Chrysler backed out of its parking spot and went east before taking the I-5 south exit towards Salem. At approximately 9:57 p.m., law enforcement initiated a traffic stop on the Chrysler on I-5 near milepost 218 and deployed a drug detection K9 to conduct a free air sniff of the exterior of the Chrysler. It alerted to the vehicle.

63. During the search of the vehicle law enforcement located approximately 114.4 gross grams of a substance that later tested presumptive positive for fentanyl. Based on my training and experience, this is an amount for distribution. The fentanyl was in a plastic baggie in the front passenger compartment. A blue and black Glock pistol with a suppresser and partially obliterated serial numbers was also located in the trunk of the Chrysler.

64. [redacted] confirmed to law enforcement that both the fentanyl and Glock belonged to him. [redacted] told law enforcement he was a fentanyl user and claimed he primarily smoked it. [redacted] told law enforcement they would find four ounces of fentanyl in the front passenger side where he was sitting that he had just purchased from Hondurans. Law enforcement asked [redacted] if he purchased fentanyl from "the voice" and [redacted] confirmed that he had within the last month. [redacted] provided two phone numbers for "the voice" which law enforcement had

already identified as [redacted] numbers. [redacted] admitted to meeting members of the DTO to drop off cash and to pick up fentanyl at the direction of "the voice". [redacted] told law enforcement that he was often fronted fentanyl and would pay afterwards. [redacted] confirmed he met with a subject driving a Lexus recently in Eugene, who law enforcement had already known as [redacted]

**[redacted] and Seizure of 214.7 Grams of Fentanyl**

65. On July 27, 2025, law enforcement officers received information that [redacted] was distributing fentanyl out of a small shed located at 2011 Harbor Drive in Springfield, Oregon. On July 28, 2025, law enforcement was granted a State of Oregon search warrant for the residence located at 2011 Harbor Drive in Springfield, Oregon, as well as [redacted] person.

66. At approximately 7:00 p.m. that night, law enforcement conducted surveillance of [redacted] Law enforcement observed [redacted] riding what appeared to be a motorized bicycle riding eastbound on Main Street in Springfield. Law enforcement observed [redacted] ride into the parking lot of the Saint Vincent de Paul located at 4555 Main Street in Springfield, Oregon, and ride up to a cream-colored Lexus that had already been parked in the parking lot. [redacted] got off the motorized bike and got into the passenger seat of the Lexus. Approximately one minute later, [redacted] got out of the Lexus and rode the motorized bike westbound on Main Street.

67. Shortly after leaving the parking lot, law enforcement conducted a traffic stop on [redacted] on Main Street in Springfield. [redacted] was detained by law enforcement and advised of the existence of the search warrant on [redacted] residence. [redacted] was also

provided with his Miranda rights, to which [redacted] stated he understood. A search of [redacted] and the cross-body bag in his possession revealed a zip lock freezer bag containing 214.7 grams of a substance lab testing confirmed to be fentanyl. Based on my training and experience, this is an amount for distribution.

68. While the traffic stop of [redacted] occurred, Springfield Police Department served the search warrant at the residence located at 2011 Harbor Drive in Springfield, Oregon. Law enforcement transported [redacted] to the residence where he was interviewed. A search of the residence resulted in finding multiple items, including a .22 caliber handgun with serial number 092539, in a white dresser by the head of a bed. Law enforcement also observed multiple items with suspected drug residue, including a knife in the kitchen, tin foil, glass pipes, and a white Ziploc bag with residue on it as well.

69. [redacted] stated that the chunks of powder in his possession was fentanyl and that he was sourcing his fentanyl through a Mexico source that went by "[redacted] known to be an alias [redacted] provided to his customers. [redacted] advised that he messaged his source on WhatsApp, and that the source used cell phone numbers law enforcement associated with [redacted] [redacted] advised that he has purchased fentanyl from "[redacted] on 4-5 different occasions. [redacted] stated that he purchased 4 ounces of fentanyl the first time he sourced from "[redacted] and approximately 8 ounces the second time. [redacted] stated that "[redacted] had been fronting him fentanyl, and that [redacted] would always pay back what he could for the previous purchase. [redacted] stated that he currently owed "[redacted] approximately $8,000.

**<u>Matthew Medeiros and Seizure of 18 Pounds of Methamphetamine and 2 Pounds of Fentanyl</u>**

70. On July 3, 2025, law enforcement served a state warrant at the residence for

Medeiros, a known associate of DTO, in Coos Bay, Oregon. During the search warrant, law enforcement located approximately 18 pounds of methamphetamine and approximately 2 pounds of fentanyl in Medeiros' trailer and residence. Based on my training and experience, this is an amount for distribution. Medeiros confirmed all the drugs located were his and that it had come from "[redacted] The drugs were later lab tested and tested positive for fentanyl and methamphetamine.



71. Medeiros was advised of his rights and told law enforcement that there was approximately 20 pounds of methamphetamine inside the travel trailer where he had come out of. Medeiros stated he had received the 20 pounds of methamphetamine from a courier working on behalf of "[redacted] who law enforcement knows to be an alias for [redacted] Medeiros advised the courier had come into his house through his garage to drop the drugs off at approximately 12:00 p.m. the day prior (July 2, 2025). He said he provided the courier with approximately $10,000 - $20,000, which he described as being payment towards the last load of drugs that he had been fronted by [redacted] Medeiros advised that he would normally be fronted approximately 20 pounds of methamphetamine at a time and would then pay the money

at the time of being fronted for the previous drug fronts. Medeiros also identified [redacted] as a drug courier for the DTO from whom he had received drugs and Argueta as a person he had met with to whom he had given her a large amount of money that he owed to the DTO.

**[redacted] and Seizure of 15 Pounds of Methamphetamine**

72. In March 2026, law enforcement identified [redacted] as a California based methamphetamine and fentanyl courier for [redacted] On March 25, 2026, [redacted] cell phone pings indicated it crossed the border into Oregon from California. At approximately 4:38 p.m., law enforcement made a positive identification of [redacted] driving a black Nissan Rogue bearing California plate 9LPT262 near milepost 89 on I-5.

73. [redacted] was stopped by law enforcement at milepost 119 on I-5 at 5:00 p.m. [redacted] was the driver and the passenger was later identified [redacted] adult daughter. A K9 was deployed and conducted an open-air sniff around the vehicle and altered to the presence of controlled substances coming from the Nissan. Law enforcement located 15 packages of suspected methamphetamine in the trunk wrapped in saran wrap and axel grease. Each package weighed approximately one pound. Based on my training and experience, this is an amount for distribution. The drugs have been sent for lab testing but based on my training and experience, have the consistency and feel of methamphetamine.

74. At approximately 6:14 p.m., law enforcement interviewed [redacted] She claimed people had kidnapped her brother in Guadalajara, Mexico, and were forcing her to bring "it" up to Oregon. When asked, [redacted] stated that she did not know what "it" was. [redacted] claimed that she had received a call approximately one month prior, stating that her brother was kidnapped, and that she would only be able to speak to him if she did what they asked. When asked who

the main person giving her instructions was, [redacted] stated that he called himself "Boss" or "Patron". [redacted] stated that this was her first time transporting for the boss, and that she was not getting paid to do it. [redacted] stated that she was told she would only be able to talk to her brother if she did what the boss said.

75. [redacted] consented to a search of her phone, which revealed that both Lopez and Escobar were saved in their contacts with their numbers previously identified. At 5:26 p.m., Escobar messaged on Facebook messenger “que estra pasando” which translates to “What is happening.” She also had text messages with Escobar in 2025 with address for the Costco where the controlled buy had occurred. Law enforcement observed additional messages sent on February 16, 2026, between Escobar and [redacted] where [redacted] messaged that two came in so she had to open and weigh them one by one and that she would return in the morning to seal the last bag. On February 18, 2026, [redacted] also sent messages indicting CashApp transactions of $2,000, $700, and $1,000. Escobar labeled them as “for rent”, “for reduction massage”, and “for gift”.

76. Furthermore, law enforcement found multiple images of an unknown Hispanic male counting large stacks of rubberbanded U.S. Currency as well as a large amount of U.S. Currency laid out of a bed from February 16, 2022.




**<u>Rene Cazares and Seizure of 131 Grams of Fentanyl and 3 Pounds of Methamphetamine</u>**

**A. February 11, 2026, Controlled Buy of 103 grams of Fentanyl from Cazares**

77. On February 10, 2026, the law enforcement working in a DEA-UC-5 capacity messaged [redacted] on WhatsApp to coordinate a controlled purchase of methamphetamine and fentanyl. DEA-UC-5 inquired with [redacted] about purchasing 2 pounds of methamphetamine and 1 ounce of fentanyl "2 clear 1 f" with "clear" used as a code word for methamphetamine by this DTO. [redacted] responded to DEA-UC-5 stating, "let me know", and advised that methamphetamine was $1,400 per pound, and that fentanyl was $800 per "Piece" which is a common slang term used to describe an ounce of fentanyl.

78. On February 11, 2026, DEA-UC-5 messaged [redacted] again and advised that the UC was ready to purchase the drugs. [redacted] responded that "clear" was all out, and that another car with more would be arriving the next day, February 12, 2026. DEA-UC-5 then asked [redacted] if he had any fentanyl still available, to which [redacted]

responded "freddy we have all day long", and further advised that "clear" goes quickly, as they only take "50 of them" at a time. DEA-UC-5 then responded stating that DEA-UC-5 had enough for "4 f", meaning 4 ounces of fentanyl. [redacted] said OK.

79. In anticipation of the controlled purchase, law enforcement traveled to Salem, Oregon, to establish surveillance. DEA-UC-5 was also provided with $3,200 to complete the transaction, as well as an audio recorder for DEA-UC-5's safety as well as evidence collection.

80. DEA-UC-5 then messaged [redacted] again, inquiring about where to go for the deal. [redacted] responded by saying "Salem" and later said "Costco". Surveillance was then established at the Costco as well as the 5265 Salal St., Salem, Oregon. Once DEA-UC-5 arrived at Costco, DEA-UC-5 messaged [redacted] advising that DEA-UC-5 was at the deal location. [redacted] then responded and confirmed that DEA-UC-5 wanted 100 grams of fentanyl and had the cash for it. DEA-UC-5 responded and said "yeah I got 3200".

81. At approximately 3:53 p.m., DEA-UC-5 received a call from cell phone number 971-510-0951. DEA-UC-5 answered and an unknown male identified himself as "[redacted] nephew", with "[redacted] being an alias [redacted] uses. The male, later identified as Cazares, confirmed that DEA-UC-5 was in Salem at the Costco and stated he would "get it ready" and give the DEA-UC-5 a call when he was on his way with it.

82. At approximately 4:10 p.m., law enforcement observed a silver Mercedes ML3 with Oregon license plate 932QMR drive out of the apartment parking lot and drive towards the Costco. Surveillance was maintained on the vehicle as it drove to the Costco. At approximately 4:11 p.m., DEA-UC-5 received another phone call from Cazares using the same number as before. Cazares asked DEA-UC-5 where DEA-UC-5 was to which DEA-UC-5

responded by saying they were at the Costco parking lot near the Chick-Fil-A.

83. Law enforcement then saw the Mercedes park by DEA-UC-5's vehicle. Law enforcement saw a male wearing a dark colored beanie and glasses, with a red and black colored tote style bag exit the driver's seat of the Mercedes and get into the passenger side of DEA-UC-5's vehicle.

84. Once Cazares was inside DEA-UC-5's vehicle, DEA-UC-5 handed Cazares the $3,200. Cazares then counted the money in front DEA-UC-5. Once Cazares was done counting the money, he took a beanie out of the red and black bag that contained a scale. Cazares then took out a second beanie that contained a bag of an off-white powdered substance. Cazares advised DEA-UC-5 that he was weighing it out to show DEA-UC-5 they were getting the amount they asked for. Cazares then weighed out the bag, and it came out to approximately 103 grams. Cazares advised DEA-UC-5 that it was 3 grams over due to the packaging. Cazares then took the powdered substance and placed it into a bigger Ziploc bag, before handing it to DEA-UC-5. The fentanyl was later sent to the DEA lab and confirmed as fentanyl.

85. Cazares then got out of DEA-UC-5's vehicle and back into the Mercedes, before leaving the location.

**B. April 15, 2026, Controlled Buy of 3 Pounds of Methamphetamine and 1 Ounce of Fentanyl from Cazares**

86. On April 16, 2026, DEA-UC-5 contacted [redacted] again to inquire about purchasing more drugs. [redacted] stated that he could not guarantee availability of methamphetamine as it goes quickly. [redacted] eventually advised DEA-UC-5 later that night that they were out of "cold ones", referring to pounds of methamphetamine. However, they would be getting more the next day, April 17, 2026. [redacted] also advised that

methamphetamine was $1,250 per pound now instead of the $1,400 per pound it was before.

87. The following morning, DEA-UC-5 messaged [redacted] to inquire about availability that day for a deal. [redacted] responded, stating that they would be ready for DEA-UC-5 around 12:00 p.m. to 1:00 p.m. that afternoon. Later that morning at approximately 11:00 a.m., [redacted] messaged DEA-UC-5 again stating that they were ready for DEA-UC-5.

88. At approximately 12:00 p.m., law enforcement established surveillance at the Costco as well as the 5265 Salal St., Salem, Oregon. DEA-UC-5 was also supplied with $4,600 for the deal as well as an audio recorder for the DEA-UC-5's safety as well as evidence collection. DEA-UC-5 was then followed by law enforcement officers from the neutral location to the Costco in Salem.

89. At approximately 12:40 p.m., DEA-UC-5 received a phone call from Cazares. Cazares stated that they were getting the product ready and that they would send DEA-UC-5 an address to meet Cazares at to conduct the deal. Approximately four minutes later, DEA-UC-5 received a text from the same phone number with the address 1024 Sharon Loop SE in Salem, Oregon. DEA-UC-5 drove to the address and waited for Cazares.

90. At approximately 12:59 p.m., law enforcement observed Cazares walk out of the front door of the apartment building and walk over to a gray Chevrolet pickup truck with Oregon plate 449LTQ. Cazares entered the driver's seat of the pickup truck and left the area. Due to Cazares's surveillance conscious driving in the past, surveillance was not maintained on Cazares, however approximately five minutes later, law enforcement saw the pickup truck drive up and park directly behind DEA-UC-5's vehicle on Sharon Loop Drive SE.

91. Law enforcement then saw Cazares exit the driver's seat of the pickup truck with a dark colored backpack, as well as a red tote-style bag and get into the passenger side of DEA-UC-5's vehicle. Inside the vehicle, DEA-UC-5provided Cazares with $4,600. Cazares then counted the money in front of DEA-UC-5. After counting the money, Cazares provided DEA-UC-5 with approximately 3 pounds of suspected methamphetamine and approximately 1 ounce of suspected fentanyl. Cazares then got out of UC-1's vehicle and entered the driver's seat of the gray pickup truck. The drugs have been sent for lab analysis but, based on my training and experience, have the color, consistency, and smell as methamphetamine and fentanyl. DEA-UC-5 then exited the location, while the pickup truck remained stationary.

92. Approximately one minute after DEA-UC-5 left the area, Cazares left the area and eventually turned onto Salal Street SE, and park in front of his residence. Law enforcement then saw Cazares exit the driver's seat of the pickup truck and walk towards the front door of the apartment building. Law enforcement, on foot wearing plain clothes, followed Cazares to the front door. Cazares then let the law enforcement officer into the building. Law enforcement then went up to the third floor, followed by Cazares.

93. The drugs purchased by DEA-UC-5 from Cazares were sent to the DEA-lab to be tested. Based on my training, experience, and knowledge of this investigation the drugs seized were methamphetamine and fentanyl. The color, consistency, and feel of both were similar to methamphetamine and fentanyl I've seized in the past from this DTO.

**Patrick Newport and Seizure of 1400 Grams of Fentanyl**

94. In early 2025, law enforcement identified Newport through phone tolls of [redacted] in which Newport was a frequent contact.

95. In December of 2025, law enforcement applied for and was granted a State of Oregon tracking warrant for Newport's vehicles, both an Acura RSX with Oregon license plate 462HCE and an Acura TL with Oregon plate TB30722.

96. On April 4, 2026, at approximately 4:50 p.m., law enforcement noticed that GPS tracker data for Newport's Acura TL departed Newport's residence located at 924 NW Sycamore Avenue, Apartment 6, in Corvallis, Oregon. Law enforcement has seen Newport use the Acura multiple times in the past through physical surveillance. Law enforcement had previously identified this apartment as Newport's place of residence through physical surveillance. Tracker data showed that the Acura traveled to I-5, where it turned northbound towards Salem. Through my knowledge of the investigation, I know that a stash location for [redacted] is in Salem, Oregon. I know this through multiple controlled purchases that have been made by [redacted] utilizing an undercover officer, in which Cazares has sold a UC multiple ounces of fentanyl and methamphetamine. It was also noted that throughout the day, Newport had approximately 40 contacts with a number associated with [redacted] including while traveling up to Salem, Oregon. At approximately 5:36 p.m., tracker data showed that the Acura entered the parking lot of the Safeway located at 5660 Commercial St. SE in Salem, Oregon. The Acura remained stationary for a brief period. During this time, phone data showed that Newport contacted [redacted] approximately 16 times.

97. The Acura then drove north through the parking lot, before traveling eastbound onto Fabry Road SE, and northbound onto Sugar Plum St. SE. The Acura then drove through a residential neighborhood that law enforcement had previously observed the Acura travel to for suspected drug runs. The Acura parked on SE Kali Street at approximately 5:48 p.m. and left

the area approximately four minutes later. In that four-minute time frame, phone records showed Newport had two contacts with [redacted]

98. After leaving the area, tracker data showed that the Acura made several loops through several side roads. Through my training and experience, I know that drug traffickers often conduct "heat checks" in which they will make several random turns and make several loops down random side streets, to observe if they are being followed by law enforcement. At approximately 6:42 p.m., the Acura arrived back at Newport's residence located at 924 NW Sycamore Ave., Apartment 6 in Corvallis.

99. In April of 2026, law enforcement applied for and was granted a State of Oregon search warrant for Newport's apartment in Corvallis.

100. On April 19, 2026, at approximately 10:00 p.m., law enforcement conducted a traffic stop on Newport and executed a search warrant on his residence at approximately 11:30 p.m. Before being asked any questions, Newport admitted to having fentanyl on his person.

101. He was read his Miranda rights and stated that he had been purchasing drugs from an individual he knew as "[redacted] since January of 2025. As mentioned previously, "[redacted] is a common alias used by [redacted] Newport stated that the first time he purchased drugs from the DTO, he tried to purchase 4 ounces of fentanyl, however, was given approximately a quarter pound. Newport stated that the difference was fronted to Newport by "[redacted] which ultimately led to Newport constantly owing the organization and being fronted fentanyl.

102. Newport stated that the most he had ever been given at one time was approximately 1 kilogram of fentanyl in July of 2025, however, usually is given approximately half a kilogram. Newport stated that the last time he was given drugs from the DTO was April

18th and that he would normally be given drugs approximately every two weeks. Newport stated that he would normally coordinate through “[redacted] about when to pick up drugs based off when the DTO had drugs on hand.

103. Law enforcement executed the search warrant on his apartment and seized 10 firearms in the primary bedroom closet with a large off-white brick of believed to be fentanyl based on appearance, consistency, and color and they located a black and red backpack in the bedroom containing a large chunk of fentanyl with multiple pistols inside. The drugs weighed 1504 gross grams and have been sent for lab analysis. Based on my training and experience, this is an amount for distribution.



**<u>Felicia Waite and Seizure of 25.9 Grams of Methamphetamine</u>**

104. On April 20, 2026, law enforcement observed a phone number subscribed to Felicia Marie Waite in communication with a [redacted] number. Law enforcement set up on Waite`s address per Oregon DMV, and in local police files, and observed a white Honda Sport Utility Vehicle (SUV) parked in the parking lot next to the address.

105. Law enforcement observed Waite depart 985 Hatton Avenue in her white Honda

SUV. Law enforcement observed Waite arrive at the Albertsons parking lot at 4740 Royal Avenue. Law enforcement set up in the parking lot observed Waite meet with a Hispanic Male Adult (HMA) in the parking lot. Law enforcement observed the HMA place a red bag in Waite`s Honda via the open passenger window then the HMA walked away. Law enforcement could observe a portion of the bag above the bottom edge of the passenger side window as Waite drove away. Law enforcement conducted a traffic stop on in her Honda SUV on Concord Street, just east of Echo Hollow Road.

106. Law enforcement deployed a drug K9 partner around Waite`s vehicle and it alerted to the presence of a controlled substance. Waite consented to search her vehicle and during the search law enforcement located approximately 3 pounds of suspected methamphetamine, approximately 1 pound of suspected fentanyl, $9,000 in U.S. Currency and a pay/owe sheet. Based on my training and experience, this is an amount for distribution. The fentanyl and methamphetamine were later field tested and confirmed positive as methamphetamine and fentanyl.

107. Waite also consented to a search of her residence located at 985 Hatton Avenue Eugene, Oregon. Law enforcement walked with Waite to the residence. The following items were found inside the closet in the master bedroom belonging to Waite, 10 ounces of suspected fentanyl, 35.8 grams of suspected methamphetamine, digital scales, gallon-sized bags with drug residue, 6 handguns, and 2 shotguns. Law enforcement fielded tested the methamphetamine and fentanyl, which confirmed it was methamphetamine and fentanyl.



108. While interviewing Waite she confirmed she was a convicted felon. Waite told law enforcement that she was going to owe money to the DTO because of the drugs that were seized. Waite told law enforcement that she had paid for the methamphetamine, but not the fentanyl that was located in her vehicle. Waite told law enforcement that she was scared because the DTO would expect her to pay for the fentanyl that was fronted.

**[redacted] and Seizure of 75 Grams of Fentanyl**

109. Law enforcement has observed [redacted] a known fentanyl distributor in Coos Bay, Oregon, on the tolls of suspected [redacted] numbers since January 2025.

110. On April 26, 2026, law enforcement observed the geolocation ping on a phone being utilized by [redacted] pinging in the Salem, Oregon, area where customers of the DTO frequently get sourced by Cazares at the direction of [redacted] Law enforcement was able to identify the vehicle as an older silver Chrysler Van through a series of license plate readers based on where the trip originated and ended.

111. At approximately 12:00 p.m., law enforcement observed the geolocation ping on [redacted] phone in the Eugene area before it started traveling west on State Route 126W. Law enforcement observed that [redacted] was using a second phone to communicate with [redacted] through WhatsApp.

112. Law enforcement located the vehicle on State Route 126W near milepost 26 and conducted a traffic stop on the vehicle near milepost 10. [redacted] was a back passenger in the vehicle. A drug detection K9 sniffed the exterior of the vehicle and alerted to the B pillar between the front and back passenger doors.

113. Law enforcement separated the occupants and contacted [redacted] knowing she was the one in contact with [redacted] [redacted] stated she had fentanyl in her bra and voluntarily removed a ziplock style bag with a red seal containing an off-white piece of fentanyl. This packaging was identical to multiple other fentanyl seizures from this DTO that law enforcement has seized since January 2026. The fentanyl was later field tested and showed a presumptive positive for fentanyl and weighed 75 grams. Based on my training and experience, this is an amount for distribution.

114. [redacted] was advised of her Miranda rights and confirmed she understood them. She told law enforcement she had traveled to Salem at the direction of [redacted] Once in Salem she was contacted by a runner who brought the fentanyl to her. [redacted] told law enforcement she had paid $1,000 for the fentanyl and was provided with 3 pieces (75 grams). [redacted] said it was currently $1,000 an ounce and she was fronted 2 pieces. [redacted] told law enforcement it was common for her to be fronted, and she owed [redacted] thousands. Law enforcement asked if she owed more than $20,000 and she confirmed she did.

115. [redacted] told law enforcement the source she was in contact with was from Sinaloa, Mexico, and went by "[redacted] [redacted] didn't know the runner's name but provided law enforcement with both the numbers she had contacted to purchase the fentanyl. Law enforcement had already identified both numbers in this investigation as belonging to both [redacted] the source of supply, and Cazares the stash house operator in Salem.

**Conclusion**

116. Based on my training, experience, and knowledge of the investigation, there is probable cause to believe, and I do believe, that [redacted] Tania Argueta, Patsy Escobar, Angel Lopez, Rene Cazares, [redacted] Julia Dorfler, Matthew Medieros, [redacted] Patrick Newport, Felicia Waite, and [redacted] conspired to possess with the intent to distribute over 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine and over 400 grams or more of a mixture or substance containing a detectable amount of fentanyl, Schedule II controlled substances, in violation of 21 U.S.C. §§ 841(a)(1),(b)(1)(A)(vi) and (viii) and 846. I further believe there is probable cause to believe, and I do believe, that [redacted] Julia Dorfler, Matthew Medieros, [redacted] Patrick Newport, and Felicia Waite possessed with the intent to distribute over 400 grams or more of a mixture or substance containing a detectable amount of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1),(b)(1)(A)(vi). I further believe there is probable cause to believe, and I do believe, that Rene Cazares, [redacted] Matthew Medieros, [redacted] and Felicia Waite possessed with the intent to distribute over 500 grams or more of a mixture or substance containing a detectable amount of

methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1),(b)(1)(A)(viii). I further believe there is probable cause to believe, and I do believe, that Tania Argueta, [redacted] Rene Cazares, [redacted] and [redacted] possessed with intent to distribute 40 grams or more of a mixture of substance containing a detectable amount of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1),(b)(1)(B)(vi). I further believe there is probable cause to believe, and I do believe, that Julia Dorfler possessed with intent to distribute 50 grams or more of a mixture of substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1),(b)(1)(B)(viii).

117. Prior to being submitted to the Court, this affidavit, the accompanying complaint, and the requested arrest warrants were all reviewed by Assistant United States Attorney (AUSA) Joseph Huynh, and AUSA Huynh advised me that, in his opinion, the affidavit and application are legally and factually sufficient to establish probable cause to support the issuance of the requested criminal complaint and arrest warrants.

**<u>Request for Sealing</u>**

118. I further request that the Court issue an order sealing, until further order of the Court, all papers submitted in support of the requested arrest warrants, including the application, this affidavit, the attachments, and the requested arrest warrants. I believe that sealing these documents is necessary because the information to be seized is relevant to an ongoing investigation, and any disclosure of the information at this time may endanger the life or physical safety of an individual, cause flight from prosecution, cause destruction of or tampering with evidence, cause intimidation of potential witnesses, or otherwise seriously jeopardize an

investigation. Premature disclosure of the contents of the application, this affidavit, and the attachments, and the requested search warrants may adversely affect the integrity of the investigation.

*By phone pursuant to Fed. R. Crim. P. 4.1*
KRISTOFER STRUBEL
Task Force Officer, DEA

Sworn in accordance with the requirements of Fed. R. Crim. P.4.1 by telephone at 2:16 p.m. a.m./p.m. on April 28, 2026.

Amy E Potter
HONORABLE AMY E. POTTER
United States Magistrate Judge